IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 27, 2010

## EDDIE LEE MURPHY, SR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sumner County**
**No. 624-2007    Tom E. Gray, Judge**

---

**No. M2009-01993-CCA-R3-PC - Filed January 20, 2011**

---

The Petitioner, Eddie Lee Murphy, Sr., appeals the Sumner County Criminal Court's denial of post-conviction relief from his conviction for felony murder and resulting life sentence. See T.C.A. § 39-13-202(a)(2) (2003) (amended 2005, 2007). He contends that the trial court erred in denying him relief because (1) he did not understand the nature of the charges against him and the consequences of his guilty plea, (2) he was not adequately informed of his right against self-incrimination, (3) trial counsel was ineffective, and (4) his guilty plea was involuntary. We affirm the judgment of the trial court.

**Tenn. R. App. 3 as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Mike Carter, Gallatin, Tennessee, for the appellant, Eddie Lee Murphy, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; L. Ray Whitley, District Attorney General; and Wayne Hyatt, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner pled guilty to felony murder. The State's recitation of facts at the guilty plea hearing reflected that he killed Dorothy Jordan while committing a robbery. The victim was seventy-seven years old and lived alone. Gallatin Police Investigator Charlie Harris found her body in her home on June 8, 2004. The victim was lying in the doorway separating the living room from the hallway. She had a four-inch cut on the left side of her throat and defensive wounds on both hands.

Officer Harris's investigation revealed that the victim's purse and a dresser drawer had been searched. Officer Harris found bloodstains throughout the home and found a chair overturned in the living room. On the day of the murder, police found a small tag in the victim's driveway with "567 Small" written on it.

Tom Deering of the Davidson County Medical Examiner's Office performed an autopsy and found that the cause of death was the laceration to the victim's throat. Dr. Deering determined that the victim died between 7:00 a.m. and 10:00 a.m. on June 8, 2004.

The police developed the Petitioner as a suspect through various witness interviews. At approximately 11:00 p.m. on the day after the murder, police located the Petitioner in Nashville at the home of his aunt, Mary Thomas. Police found a pair of black Nike tennis shoes at the home. The Petitioner's cousin, Perry Adams, at first claimed that the shoes were his but later stated that the shoes belonged to the Petitioner, who asked him to switch shoes. The Petitioner admitted to the police that the shoes were his and that he had asked his cousin to switch shoes. A Metro Police Department crime scene investigator confirmed that the shoes had blood on them. The Tennessee Bureau of Investigation's (TBI's) crime laboratory tested the shoes and found that the blood samples matched the victim's DNA.

The Petitioner told Officer Harris that he lived at 567 Small Street in Gallatin, which was one of the victim's rental properties. He admitted he was in Gallatin during the time of the murder. The Petitioner said that he lived at the Small Street address with a woman named Kim Franklin and that he did maintenance work on the victim's rental properties to help Ms. Franklin pay the rent. The Petitioner told the officer that he had been in the victim's house before and that he would routinely call the victim to see if she had any work for him. The Petitioner also cut the grass at several of the victim's rental properties. Shortly before her murder, the victim told her handyman that she was not satisfied with the Petitioner's work and that she wanted her handyman to cut the grass.

On June 10, 2004, police executed a search warrant at the Petitioner's home. The police found a shirt in the dryer that was covered in bleach and appeared to have bloodstains on it. The Petitioner smelled of bleach when he was found in Nashville the day before, and he claimed the odor was from washing dishes. The shirt he was wearing also appeared to be stained with bleach. At the guilty plea hearing, the Petitioner agreed under oath that the facts as recited by the State were substantially correct.

The Petitioner filed a pro se petition for post-conviction relief on July 20, 2007, and the trial court appointed counsel. At the post-conviction hearing, the Petitioner testified that he attended high school through the eleventh grade but did not graduate. He agreed he was housed in the Department of Correction from the time of his arrest through his guilty plea.

He said that trial co-counsel, who represented him at the plea hearing, sent him a stack of discovery materials in 2004 but that he did not see trial counsel until 2005 when he was transferred to Riverbend Maximum Security Institution ("Riverbend"). He said trial counsel did not go over the materials, did not read the papers to him, and did not point out specific documents.

The Petitioner testified that from the time of the murder in 2004 until he entered his plea in August 2006, he wanted to go to trial and believed that trial counsel was preparing for trial. He said he discussed the evidence with trial counsel's investigators and then spoke with trial counsel. He agreed that trial counsel visited him, presented information about his case, and discussed issues.

The Petitioner testified that he met with co-counsel on August 28, 2006. He said that he did not read the plea agreement before signing it but that co-counsel read it to him and held it where he could see it. He said he did not ask questions about the agreement at the August 28 meeting. The plea agreement was entered into evidence, and the Petitioner read the following handwritten sentence from it: "Plea to felony murder, count two; the premeditated murder count is to be dismissed, count one." He said that the agreement did not indicate what the sentence would be or what the elements of felony murder were and that he did not discuss the elements of felony murder with co-counsel. He said he signed the plea agreement on August 28 because trial counsel told him in a past meeting that he could not win the case and because his mother encouraged him to enter a guilty plea.

The Petitioner testified that the plea agreement did not mention consecutive sentencing and that trial counsel did not discuss consecutive sentencing during their August 28, 2006 meeting. He agreed he was serving a sentence from a parole violation when he signed the plea agreement. He reviewed the judgment and read that it stated his sentences would run consecutively. He said consecutive meant that he would have to finish one sentence and start another.

The Petitioner testified that the trial court did not explain the elements of felony murder. He said the trial court told him that he was giving up the right to a trial by jury and the right to appeal. He said that he did not understand that serving a life sentence would be fifty-one years and that trial counsel did not explain it to him before the hearing. He said that when the trial court explained that his earliest parole eligibility would be after fifty-one years, he tried to talk to trial counsel but that counsel told him to wait until after the hearing. He said he would not have entered the plea agreement if he had understood that eligibility would be after fifty-one years.

The Petitioner testified that he was aware that trial counsel hired a mitigation expert, which he defined as a "person who tries to keep the death penalty off the table." He said he had hoped that if convicted of first degree murder, he would not get the death penalty.

The Petitioner testified that the trial court did not mention his privilege against self-incrimination. He agreed the trial court told him that he had the right to take the case to trial, the right to cross-examine the State's witnesses, the right to call witnesses on his own behalf, the right to testify, and the right to have the jury instructed that his decision not to testify could not be used against him. He defined self-incrimination as "you get up on the stand and basically just tell on yourself." After reviewing a paragraph from the plea hearing transcript, he said the court told him that he had the right to defend himself. He said that he understood he could either "tell on" himself or defend himself and that no one explained the difference to him or defined self-incrimination.

The Petitioner testified that he asked trial counsel to explore additional evidentiary issues but that trial counsel only responded that the investigator would look into them. He said that the key tag with 567 on it was not tested for fingerprints and that if he had known a neighbor saw a sport utility vehicle (SUV) parked in back of the victim's house, he would not have pled guilty. He said that trial counsel did not discuss with him the items he wanted investigated.

On cross-examination, the Petitioner testified that he was forty-four years old and that when he entered his guilty plea, he was forty-one years old. He said he could read. He agreed that he pled guilty to robbery on June 22, 2000, that the same trial judge presided at that hearing as when he pled guilty in this case, and that the judge questioned him then about whether he wanted to plead guilty. He agreed that his charge in 2000 was for aggravated robbery and that it was reduced to robbery when he pled guilty. He said he knew that the State was asking for the death penalty and that the State would drop the request if he pled guilty. He said that he knew he would avoid going to trial and possibly receiving the death penalty by pleading guilty but that the difference in punishment was not the reason for his plea.

The Petitioner testified that he had a good relationship with trial counsel and co-counsel and that he met with them multiple times. He said that trial counsel hired a private investigator on his behalf and that he met with two investigators five or six times. He said the investigators talked about the people he was with the night before the murder but not about the evidence. He agreed that trial counsel discussed the State's evidence with him and that when he pled guilty, he knew what the State's evidence was. He said trial counsel told him about an inmate whom the State intended to call as a witness against him. He said counsel told him that the inmate would testify to overhearing the Petitioner admit to the

killing. He said the State was prepared to prove that the shoes with the victim's blood were his shoes, but he denied that the shoes were his. He agreed that he knew about the key tag but denied that he knew the State was prepared to show he had a large amount of money on him at the time of the murder.

The Petitioner testified that he told the trial court he understood the proceedings and that he did not lie to the court. He said he was not under the influence of alcohol or drugs when he entered his plea. He said he answered the trial court truthfully when he agreed that trial counsel reviewed the plea agreement with him, that he understood it, and that he signed it. He said when the trial court asked him if he understood what he was doing there and he said yes, he meant that he understood why he was in court and that he was charged with felony murder. He agreed that he understood the sentence for felony murder would be life with parole but said that he "just didn't understand the law."

The Petitioner testified that his answers to the trial court's questions in which he admitted entering the victim's home and murdering her and said he still wished to enter a guilty plea were correctly entered in the transcript as "Yes, ma'am." He agreed that he heard the State recite the facts at the plea hearing and that he heard the State ask that the sentence run consecutively to his robbery sentence. He said that at the time of the plea hearing, he did not know the difference between consecutive and concurrent but that he had since learned the difference.

The Petitioner testified that he believed fingerprint testing of the key tag would have shown that his fingerprints were not on the tag and that this result would have made a difference because "latent testing" of the victim's house showed that his fingerprints were not there. He agreed that the evidence would have looked worse for him if his fingerprints were on the tag and that he did not know if his prints would have been found. He said trial counsel did not discuss with him the advantages and disadvantages of pleading guilty and receiving a life sentence.

Co-counsel testified that he was appointed to represent the Petitioner six days after the State filed a notice in August 2005 that it would seek the death penalty. He said that he was a death penalty qualified attorney and had handled approximately ten cases in which the State was pursuing the death penalty plus others in which the State filed a notice of intent to seek the death penalty in an effort to settle. He said he met several times with the Petitioner at Riverbend, sometimes alone and sometimes with trial counsel. He said both he and trial counsel were in the courtroom when the Petitioner entered his guilty plea.

Co-counsel testified that he last met with the Petitioner on August 28, 2006, and that he reviewed the plea petition with him then. He said his usual practice was to go over a plea

word for word with the client sitting beside him. He said the plea agreement entered into evidence in this case was the agreement required by Tennessee Rule of Criminal Procedure 11. He said the Petitioner had to understand the offense to which he was pleading and the consequences in order to enter an intelligent plea. He acknowledged that the plea did not state that the life sentence would equate to sixty years or fifty-one years before parole eligibility.

Co-counsel testified that in a meeting on August 16, 2006, he and trial counsel discussed with the Petitioner parole eligibility after fifty-one years and the difference between a life sentence without parole and one with parole. He said he told the Petitioner that the difference would mean little to him because he would probably die in prison either way. He said he and trial counsel did not think the State would offer life with the possibility of parole. He said he was certain that between August 16, 2006, and the plea hearing sixteen days later, he and trial counsel reviewed many times with the Petitioner what a life sentence meant and how long the Petitioner would serve.

Co-counsel testified that he remembered conversations in which he explained the elements of felony murder to the Petitioner. He said the Petitioner did not say he had difficulty understanding the difference between self-incrimination and taking the witness stand. He said he did not remember the Petitioner's trying to interrupt to ask a question during the plea hearing.

On cross-examination, co-counsel testified that he was a criminal defense lawyer in a public defender's office in Kentucky for four years and in the Davidson County Public Defender's Office for five years. He said that he generally acted as lead counsel on death penalty cases and that trial counsel had been second-chair, co-counsel with him before. He said that in this case, trial counsel was appointed and that he offered to be co-counsel. He said that after being appointed to the case, he reviewed trial counsel's files and several hundred pages of the State's discovery materials, including lab reports, TBI reports, DNA reports, serology reports, and videotapes. He said that he reviewed the case from August to November 2005 and that he first met with the Petitioner, along with trial counsel, in November 2005.

Co-counsel testified that the Petitioner was cooperative when reviewing the case. He said that Dr. Pam Auble completed a mental health evaluation of the Petitioner and that one of her suggestions was to give information to the Petitioner in concrete blocks and general summaries. He said that he and trial counsel prepared for the case in two phases, the guilt/innocence phase and the penalty phase, and that the mental health evaluation was in preparation for the penalty phase. He said that the penalty phase defense team included a

mitigation investigator or specialist and a mental health specialist and that trial counsel also requested funds to hire an additional mitigation specialist.

Co-counsel testified that he met with the Petitioner between six and ten times while preparing the case. He said trial counsel requested the Petitioner's transfer to Riverbend in order for the Petitioner to be more accessible to counsel. He said that he believed the Petitioner understood what they were discussing and that he and trial counsel answered the Petitioner's questions. He said he and trial counsel conducted a mock cross-examination of the Petitioner at Riverbend.

Co-counsel testified that he discussed with the Petitioner what the State would have to prove for a felony murder conviction. He said that without the plea agreement, it was likely the Petitioner would have received the death penalty. He said that the evidence against the Petitioner included a confidential informant, the blood matching the victim's DNA found on the shoe, a witness identifying the shoe, the key tag found in the victim's driveway, dogs that tracked the Petitioner, and a prison informant's testimony. He said he did not remember the Petitioner's asking counsel to investigate telephone records or fingerprints on any seized items, including the key tag. He said that the Petitioner's post-conviction counsel called him to ask about telephone records, that he went through his records and talked to trial counsel, but that he found nothing indicating that the Petitioner asked for telephone records or fingerprint testing.

Co-counsel testified that he and trial counsel conducted the mock direct and cross-examination of the Petitioner on August 16, 2006, and that afterward, they discussed the plea possibilities with the Petitioner. He said that the Petitioner asked counsel to call the prosecutor about a possible plea agreement and that counsel contacted the prosecutor that day. He said that on August 22, he discussed the plea status with the Petitioner at the prison and that on August 28, he received a call from the prosecutor agreeing to settle. He said that later on August 28, he met with the Petitioner and reviewed the specific conditions before the Petitioner signed the petition. He said he also called the mitigation specialist and the Petitioner's mother to discuss the Petitioner's decision. He said that the Petitioner's mother wanted the Petitioner to plead guilty and avoid the death penalty and that counsel met with her about the details of the guilty plea a few days after the Petitioner signed the petition to plead guilty. He said that on August 29, he and trial counsel met with the Petitioner again and that he had no doubt the Petitioner knew what he was doing when he pled guilty.

On redirect examination, co-counsel testified that he was responsible for working with Dr. Auble and reviewing the mental evaluation. He said the Petitioner's IQ was seventy-six overall, which was in the low range of average intelligence. He said that he spent a lot of time explaining the case to the Petitioner and that he followed Dr. Auble's communication

suggestions because he wanted the Petitioner to understand the case, particularly because the death penalty was a possibility. He said they discussed the Petitioner's concern about his mother's and his son's ability to visit him in prison and his concern that he did not want his mother to have a son on death row.

The trial court found that the Petitioner's appointed counsel formed a team, with one directing the guilt phase and one directing the penalty phase. The court found that counsel's mitigation team determined the Petitioner's IQ to be slightly below average and that defense counsel accepted the mitigation team's advice to speak in concrete rather than abstract terms to the Petitioner. In denying post-conviction relief, the trial court concluded:

> [Trial co-counsel] was a credible witness in this matter. He is credible when he stated that there was discussion with Mr. Murphy about the death penalty, high probability of conviction, and that there was discussion of his mother's wishes, and also consideration of his son.
>
> . . .
>
> Also, there was discussion about his age and the number of years of actual time that he would serve before he became eligible for parole. And from the work of the attorneys, from the communication with Mr. Murphy by his attorneys, the Court finds that Mr. Murphy understood the plea agreement that he was offered, that he comprehended and understood, that he knowingly entered into that agreement voluntarily, of his own free will, that the two attorneys representing Eddie Lee Murphy, Sr. were effective, and the petitioner has not established that the services of his attorney [were] below the range of competence [and/or] that any acts done by them, any assistance provided to him, was prejudicial to his case. As to any allegation of ineffective assistance of counsel that's dismissed.
>
> The burden of proof is upon the petitioner by clear and convincing evidence that did not occur here. It didn't even occur by a preponderance of the evidence.
>
> . . .

The Court finds today, that upon the arrest of . . . Mr. Murphy, that he was incarcerated in the Department of [Correction] because he was out on parole. Since he was out on parole, the Court then infers that he was–he's familiar with the criminal justice system, and that he's familiar with his Fifth Amendment Right.

There was no inadequacy on explaining this to him. Mr. Murphy has not proven, by clear and convincing evidence, that he didn't understand this right against self incrimination, or that he did not voluntarily, with lack of understanding, sign the plea agreement and enter into that plea agreement then three days later in front of Judge Wheatcraft. The guilty plea was voluntarily with understanding that he made a full–with full competence of his plea, full competence to the understanding of this plea, and the punishment. He understood the charges. He also understood about self incrimination.

The Petitioner appealed.

The burden in a post-conviction proceeding is on the petitioner to prove the allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). A petitioner is required to provide "allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding." T.C.A. § 40-30-104(e) (2010). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2010).

**I (Issues 1, 2, and 4)**

The Petitioner contends that his guilty plea was involuntary because he was not adequately informed of and did not understand the nature of the charges against him, the consequences of his guilty plea, and his right against self-incrimination. The State contends that the Petitioner knew the nature of the charges against him and the consequences of pleading guilty and that he was adequately informed of his rights. We agree with the State.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a

voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). The circumstances include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993); see also Caudill v. Jago, 747 F.2d 1046, 1050-52 (6th Cir. 1984). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." Blankenship, 858 S.W.2d at 904 (citing Boykin v. Alabama, 395 U.S. 238, 242-43 (1969)).

The trial court is charged with determining if the guilty plea is "knowing" by questioning the defendant to ensure that he or she fully understands the plea and its consequences. State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999) (citing Boykin, 395 U.S. at 243-44). In Boykin, the United States Supreme Court stated that certain constitutional rights are implicated in a plea of guilty, namely, the right to a trial by jury, the right to confront witnesses, and the privilege against compelled self-incrimination, and that it would not presume a waiver of these three important rights from a silent record. 395 U.S. 238, 243 (1969). Rule 11(b) of the Tennessee Rules of Criminal Procedure outlines advice to be given to a defendant entering a plea and explicit procedures for insuring on the record that guilty pleas are voluntarily and understandingly made. However, only the constitutionally grounded rights stated in Boykin are addressable, per se, under the Post-Conviction Procedure Act. See State v. Prince, 781 S.W.2d 846, 853 (Tenn. 1989).

The Petitioner contends that he did not understand the nature of the charge against him because the trial court did not explain the elements of felony murder, particularly the mental state required for the underlying felony. The State responds that the Petitioner received a full explanation of the charge to which he was pleading guilty. We agree with the State.

Absent an explanation of the charge from the trial court, the fact that the Petitioner signed the plea agreement is not sufficient proof that he understood the nature of the charge. See State v. Crowe, 168 S.W.3d 731, 749 (Tenn. 2005). However, this court may determine

that the Petitioner received an adequate understanding of the charge from other sources, including the indictment, the prosecution's summation of the facts at the plea hearing, self-explanatory legal terms in the charge, and defense's counsel's advice. See id. At the time of the offense, felony murder was defined pertinently as "a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2003) (amended 2005, 2007).

The Petitioner contends that because the trial court did not explain the mental state for the underlying crime of robbery or theft, he did not understand what the State was required to prove at trial for felony murder. The indictment alleged that the Petitioner killed the victim during the perpetration of a robbery or theft. At the plea hearing, the Petitioner accepted the prosecutor's recitation of facts as true, including that the victim was an elderly woman who lived alone and that the Petitioner was familiar with her home. The Petitioner also answered "Yes, ma'am" to each question when the trial court asked in simple terms if he broke into the victim's home, robbed her, and murdered her. The Petitioner acknowledged that he pled guilty to robbery in 2000. The record indicates that the Petitioner was familiar with the elements of robbery and that he admitted knowing the victim's living situation, breaking into her home, stealing from her, and killing her. See T.C.A. § 39-13-401 (2010) ("Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear."). We also note that co-counsel testified that he discussed the elements of felony murder with the Petitioner. We conclude that the Petitioner was adequately informed of and understood the nature of the charges against him.

The Petitioner contends that he did not understand the consequences of his guilty plea because he did not understand the meaning of consecutive sentencing or realize that a life sentence with the possibility of parole meant fifty-one years' incarceration before parole eligibility. See T.C.A. § 39-13-202(c) (2006) (amended 2007); T.C.A. § 40-35-501(h)-(i) (2003) (amended 2006, 2007, 2008, 2009, 2010). At the post-conviction hearing, the Petitioner testified that he was serving a sentence for a parole violation when he entered this guilty plea, and he acknowledged that the trial court told him at the plea hearing that his life sentence would be consecutive to the sentence he was currently serving. The plea hearing transcript shows that the trial court encouraged the Petitioner to ask questions of the court or counsel at any point during the court's explanation and questioning. The Petitioner had the opportunity to ask for a definition of consecutive if it was unclear to him.

As to the Petitioner's eligibility for parole, the plea hearing transcript shows the following exchange:

Trial Court: And what is the sentence you are receiving?

-11-

> Petitioner: Life with the possibility of parole.
>
> Trial Court: And do you understand that a life sentence is sixty years, and that the minimum time you would have to serve before reaching your earliest parole eligibility would be fifty-one years?
>
> Petitioner: Yes, ma'am.

The Petitioner testified that at this point, he attempted to ask trial counsel a question about the sentence and that counsel told him to wait until after the hearing. The transcript shows no indication of a break in the proceeding, and co-counsel testified that he did not remember the Petitioner's attempting to ask a question. We conclude that the trial court did not err in finding that the Petitioner was adequately informed regarding the consequences of his guilty plea.

The Petitioner contends that he did not understand the right against self-incrimination waived by his guilty plea. The plea hearing transcript shows that the trial court outlined the constitutional rights the Petitioner relinquished, including the following:

> [I]f you had a jury trial, you would have the right to take that witness chair and testify in your own defense. You would not have to do that, and if you elected not to testify, I would tell the jury that could not be held against you, but it is a right you're giving up.

When the trial court asked the Petitioner if he understood that he was giving up this right, he answered, "Yes, ma'am." The court continued:

> Do you understand that in the course of accepting this plea, I'm going to question you about the underlying offense, and if you answer those questions under oath, on the record, and in the presence of counsel, your answers may later be used against you in a prosecution for perjury or false statement?

The Petitioner answered, "Yes, ma'am."

The Petitioner argues that because the court did not define the term self-incrimination to him and because he thought it meant that he "could either tell on himself or defend himself," the court failed to explain this right adequately. The record reflects that although

the trial court failed to call the right against self-incrimination by name, it explained the right in simple and clear terms, and the Petitioner stated that he understood. At the post-conviction hearing, the trial court concluded that co-counsel was a credible witness when he testified that he sat with the Petitioner and read the plea agreement to him. The record shows that the plea agreement contained an explanation of the Petitioner's waiver of his right against self-incrimination. The trial court did not err in finding that the Petitioner received an adequate explanation of this right.

We conclude that the trial court did not err in denying post-conviction relief on the basis that the Petitioner entered his plea involuntarily and unknowingly. The court based its finding on testimony regarding the Petitioner's IQ and educational level, familiarity with the criminal justice system, representation by counsel, extent of advice received from counsel and the court, and reasons for pleading guilty, including the Petitioner's concern about the evidence against him and the well-being of his family members. The Petitioner is not entitled to relief on these issues.

## II (Issue 3)

The Petitioner contends that trial counsel rendered ineffective representation by failing to (1) address evidentiary issues identified by the Petitioner, (2) discuss the benefits and detriments of pleading guilty with a life sentence compared to trial with the death penalty as a possibility, (3) explain that parole eligibility with a life sentence was after a minimum of fifty-one years, (4) include the sentence information on the plea agreement, (5) discuss the elements of felony murder with the Petitioner, (6) explain consecutive sentencing, (7) stop the plea hearing when the Petitioner attempted to ask a question, and (8) explain the Petitioner's right against self-incrimination. The Petitioner also claims that but for trial counsel's errors, he probably would not have pled guilty and would have insisted on going to trial. The State contends that there is no proof in the record to show that trial counsel were deficient in their representation. We agree with the State.

If a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland,

466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. When a petitioner pleads guilty, he must show a reasonable probability that, but for the errors of his counsel, he would not have pled guilty. See Hill v. Lockhart, 474 U.S. 52, 59 (1985); Adkins v. State, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994).

Our supreme court has held that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See id. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

In denying post-conviction relief, the trial court dismissed all claims of ineffective assistance of counsel, noting trial counsel's organization in forming two teams for the phases of representation, thoroughness in obtaining a mitigation team and additional investigator, transfer of the Petitioner for close access to counsel, multiple meetings with the Petitioner, and care taken in tailoring explanations to the Petitioner's needs. We have held that the Petitioner was adequately informed regarding the consequences of pleading guilty as opposed to going to trial, the length of his sentence, the nature of the charge of felony murder, consecutive sentencing, and his right against self-incrimination. We conclude that counsel's representation was not deficient in these areas.

The Petitioner's remaining claims are that counsel did not address some evidentiary issues, did not include the sentence information on the plea agreement, and did not stop the plea hearing when the Petitioner attempted to ask a question. As to evidentiary issues, the

Petitioner testified that he asked trial counsel to test the key tag found in the victim's driveway for fingerprints and that he wanted his attorneys to investigate whether a neighbor saw an SUV parked behind the victim's house on the day of the murder. Co-counsel testified that he looked through his notes and asked trial counsel and that neither recalled the Petitioner asking for fingerprints. The Petitioner admitted that he did not know if his fingerprints were on the key tag, and he offered no further proof regarding unexplored evidentiary issues. The Petitioner argues that at the post-conviction hearing, the trial court sustained an objection to the relevance of his testimony regarding additional evidentiary issues and that the objection prevented him from showing trial counsel's deficiency in this area.

"When a petitioner contends that trial counsel failed to discover, interview, or support witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that the petitioner's conclusory statement that trial counsel failed to properly investigate facts and potential witnesses was insufficient to show deficiency in counsel's representation). In this case, the Petitioner offered no proof that fingerprint testing of the key tag would have changed his plea, and he did not produce any additional witnesses at the post-conviction hearing. We conclude that the trial court did not err in finding that trial counsel provided adequate investigation.

The Petitioner also argues that trial counsel was deficient in failing to include the sentencing information on the plea agreement and in failing to stop the plea proceedings when the Petitioner asked counsel a question about parole eligibility. The record shows that the plea agreement contained the following sentencing information: "I understand that the Court has accepted the proposed sentence in this case and that the sentence as accepted by the Court is as follows: Life in prison with the possibility of parole." The Petitioner argues that the agreement should have included information explaining eligibility for parole. No such requirement exists for plea agreements. See Tenn. R. Crim. P. 11(c). In any event, the trial court found co-counsel's testimony that he discussed parole eligibility with the Petitioner to be credible. The hearing transcript contains no indication that the Petitioner attempted to ask a question as the court explained parole eligibility. These claims are without merit. We hold that the Petitioner failed to carry his burden of showing that trial counsel were deficient in their performance, and we also conclude that the record shows no proof that the Petitioner's decision to plead guilty was influenced by any errors of trial counsel.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE